UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN P. HANKINS,	No. 09-13395

    Plaintiff,	District Judge Arthur J. Tarnow

v.	Magistrate Judge R. Steven Whalen

CITY OF INKSTER, ET AL.,

    Defendants.

                                                      /

**REPORT AND RECOMMENDATION**

Before the Court is Plaintiff's Motion for Determination of Attorney Fees and Costs [Doc. #109], which has been referred for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B). The case settled, and Plaintiff Hankins, who signed a one-third contingent fee agreement first with Seifman & Guzall, P.C., and later with Raymond Guzall, P.C., has received all the money he would be entitled to under the settlement. Mr. Seifman has filed a lien on the attorney fees. One-third of the settlement amount has been placed in an interest-bearing escrow account.

For the reasons discussed below, I recommend that the motion be GRANTED, and that the attorney fee be divided between Mr. Seifman and Mr. Guzall, with Mr. Guzall receiving 25% plus an additional $24,000.00, and Mr. Seifman receiving the remainder.

**I.  FACTS**

**A.  Procedural History**

Plaintiff was a police officer employed by the City of Inkster. On August 27, 2009, he filed a civil complaint in this Court that included allegations of employment discrimination and retaliation [Doc. #1]. On April 10, 2010, he filed an amended

-1-

complaint [Doc. #12]. Attorney Raymond Guzall III signed both the original and the amended complaint on behalf of Seifman & Guzall, P.C., the firm that Mr. Hankins retained to represent him in his case. On February 21, 2012, the case settled.[1] The present dispute over the attorney fee stems from the fact that before the settlement, Mr. Guzall left Seifman & Guzall, P.C., and continued his representation of Mr. Hankins, at Mr. Hankins' request, through his own law firm, Raymond Guzall, P.C.

On April 26, 2012, Plaintiff filed the present Motion for Determination of Attorney Fees [Doc. #109]. On May 2, 2012, the Court ordered the Defendant to remit the funds representing the attorney fees to the Clerk of the Court "for deposit in an interest-bearing escrow account in accordance [with] Local Rule 67.1." [Doc. #112]. On the same date, the Court granted Barry Seifman's motion to intervene as a third party plaintiff [Doc. #113], and denied Plaintiff Hankins' motion to strike Mr. Seifman's motion to intervene [Doc. #112]. Mr. Seifman filed his third party complaint on May 4, 2012 [Doc. #115].

I held a status conference on October 2, 2012, at which a separate Oakland County lawsuit between Mr. Guzall and Mr. Seifman was discussed. In my Order Regarding Evidentiary Hearing [Doc. #132], I noted that "I would not permit testimony as to Mr. Guzall's allegations of pervasive wrongdoing by Mr. Seifman unrelated to this case, allegations that form the basis of a separate lawsuit pending in the Oakland County Circuit Court." I added that "[w]e will not try the Oakland County lawsuit *de facto* in the context of this evidentiary hearing on attorney fees."

---

[1] The settlement amount is subject to a confidentiality provision.

On March 26, 2013, I held a settlement conference, but a resolution could not be reached.

On March 27, 2013, the Court administratively terminated this motion and held it in abeyance, permitting the motion to be reopened following the resolution of the Oakland County Circuit Court case [Doc. #140]. The case was reopened on March 7, 2016 [Doc. #153].

### B.     Evidentiary Hearing Testimony

John Hankins, the Plaintiff, testified that he signed a retainer agreement with Seifman & Guzall, P.C. around July of 2009 (Tr. 25-26).  The agreement provided for a 1/3 contingency fee to be paid to that law firm (Tr. 13).  From the beginning, he wanted Mr. Guzall to handle his case (Tr. 40), and sometime before December of 2011 he expressed to Mr. Guzall his dissatisfaction with Mr. Seifman (Tr. 31-32, 34).  After Mr. Seifman recommended accepting a settlement offer from the City of Inskter, Mr. Hankins, finding the offer unacceptable, told Mr. Guzall that he did not want Mr. Seifman to represent him (Tr. 22).  Before Christmas of 2011, he and Mr. Guzall discussed the possibility that Mr. Guzall would part company with Mr. Seifman and either start his own law firm or join another firm (Tr. 29).  Mr. Guzall initiated this conversation (Tr. 30). When Mr. Hankins was informed that Mr. Guzall was starting his own firm, he told Guzall that he wanted to stay with him (Tr. 34-35).  This was about two months before the scheduled trial, and Mr. Hankins did not want a new attorney to come in that late in the game (Tr. 41).  Mr. Hankins testified that he wanted Mr. Guzall to handle his case regardless of whether he stayed with or left Seifman & Guzall (Tr. 40).  He signed a retainer agreement with the newly-formed Law Office of Raymond Guzall, III on February 13, 2012 (Tr. 16-17).  The agreement provided for a one-third contingency fee

(Tr. 13, 25).

Mr. Hankins testified that he never verbally told Mr. Seifman that he no longer wanted the firm to represent him, but that he mailed a letter to that effect on January 12, 2012 (Tr. 22-24). The case settled in February of 2012, and Mr. Hankins has received all of the settlement money he was entitled to (Tr. 29).

Raymond Guzall testified that he was a shareholder in Seifman & Guzall, P.C. from 2006 until he left the firm on February 6, 2012 (Tr. 42). The first shareholder agreement (Seifman Exhibit #3) gave Mr. Guzall a 5% ownership share. The agreement provided for an annual salary of $100,000 for Mr. Guzall, and also stated:

> "Division of any surplus above salaries may occur when, in the judgment of Barry A. Seifman, adequate funds are available consistent with the respective ownership interests." (Tr. 54-55).

In addition, the agreement stated:

> "In the event there appears in the judgment of Barry A. Seifman, a situation wherein it appears that the owners cannot get along, or Raymond Guzall III seeks to separate from the Company, he shall be paid the sum of Five Dollars ($5.00) for his stock ownership and all files shall remain the property of the Company."

Over time, the agreement was amended to incrementally increase Mr. Guzall's ownership share, and before he left the firm, Mr. Guzall's ownership had increased to 25% (Tr. 55-59, 66). Mr. Guzall testified that he did not interpret the shareholder agreement as a "fee-splitting agreement," although he sometimes got an extra payment, on top of his salary, at the end of the year (Tr. 50-51).

Mr. Guzall testified that he contemplated leaving the Seifman & Guzall firm as early as August or September, 2011 (Tr. 43), and made the decision to leave in November of 2011 (Tr. 68). In December of 2011 he told Mr. Hankins he was thinking about leaving the firm, and also told him that he could stay with Seifman, go to another firm, or

come with Guzall (Tr. 43-45).

Mr. Guzall testified that February 5, 2012 was when he first gave notice to Mr. Seifman that he was leaving. This was Super Bowl weekend, and Mr. Guzall left his written notice, along with Mr. Hankins' termination letter, on Mr. Seifman's chair (Tr. 43, , 47, 70-73).[2] This was also the first time he gave Mr. Seifman Mr. Hankins' termination letter (Tr. 70). He also removed a number of physical files, including Mr. Hankins' file that weekend. He had transferred electronic files a few weeks before that (Tr. 88).

Mr. Guzall signed a lease on his new office on January 12, 2012 (Tr. 68). He incorporated Raymond Guzall, P.C. on February 1, 2012 (Tr. 75). He signed a contingent fee agreement with Mr. Hankins on February 13, 2012 (Tr. 46). The terms of the ultimate settlement were placed on the record on February 21, 2012 (Tr. 93). Mr. Guzall testified that all the time he spent on the case between the time Mr. Hankins retained Seifman & Guzall and when he left the firm was work performed as a shareholder and employee of Seifman & Guzall (Tr. 89).

Barry Seifman testified that by the time Mr. Guzall left the firm, he had risen to the level of a 25% shareholder (Tr. 104). Contrary to Mr. Guzall's testimony, Mr. Seifman considered the shareholder agreement to be a fee-splitting agreement (Tr. 107-108, 111). He testified that when a settlement or award was received in a contingent fee case, and if there were sufficient funds to make a disbursement after expenses, he would distribute according to the percentages in the shareholder agreement (Tr. 106-107). He said that in general, the proportional distribution was not done on a case-by-case basis, but based on firm's the overall aggregate profit, although the fees (after expenses) would

---

[2] Super Bowl XLVI was played on Sunday, February 5, 2012.

be split earlier in the case of a large settlement (Tr. 124-126). He testified that both he and Mr. Guzall received salaries and shared in profits (Tr. 117).

Mr. Seifman testified that he did not receive Mr. Hankins' termination letter until he found it on his chair on February 6, 2012, along with termination letters from other clients (Tr. 105). This was the first time he learned that Mr. Guzall was leaving the firm, and the first time that Mr. Hankins informed him that *he* was leaving the firm and taking clients with him (Tr. 119).

## II. DISCUSSION

Mr. Seifman contends that the distribution of the Hankins attorney fee should be made according to the 75%-25% ownership shares in the law firm, arguing that the shareholder agreement is an enforceable fee-splitting arrangement. Mr. Guzall disputes this characterization of the shareholder agreement, and argues that Mr. Seifman is entitled to no more than *quantum meruit*. Because Mr. Seifman's involvement in the Hankins case was minimal, he argues, then Mr. Seifman's share of the fee should be minimal.

The shareholder agreement, along with its modifications, defined the legal relationship between Mr. Seifman and Mr. Guzall. Regardless of whether or not it is considered a fee-sharing arrangement, its 75/25 ownership provision dictates that Mr. Seifman receive 75% of the Hankins fee.

First, I am persuaded that while the shareholder agreement could have been more specific as to how fees were to be apportioned between the two shareholders, it was, in intent and effect, a fee-splitting agreement. The undisputed testimony was that Mr. Guzall was initially given a 5% ownership interest in Seifman & Guzall, and by the time he left, his ownership interest increased to 25%. It is only logical that a 25% interest was more advantageous to Mr. Guzall than a 5% interest. Yet the agreement provided that if

Mr. Guzall left the firm, he would be paid only $5.00 for his shares. What, then, was the value to him of his ever-increasing ownership percentage under the shareholder agreement? It could only have been a proportional share of the profits of the law firm, profits that were generated by fees such as those obtained in the Hankins case. This is corroborated by Mr. Seifman's testimony that after expenses were paid, he would make distributions, above his and Mr. Guzall's salaries, according to the ownership percentages in the shareholder agreement.  Whether these distributions would be made at the end of the year, based on aggregate profits, or on a case-by-case basis in the event of a large fee, they were made proportionally to Seifman's and Guzall's respective ownership percentages. The shareholder agreement can therefore be reasonably interpreted to be a fee-splitting agreement.

In *McCroskey, Feldman, Cochrane & Brock, P.C. v. Waters*, 197 Mich.App. 282, 287, 494 N.W.2d 826 (1993), the Court held that fee-splitting agreements do not violate the Michigan Rules of Professional Conduct, but rather "simply seek[] to obviate time-consuming squabbles that formerly arose when plaintiff's entitlement to its fair share of any fee generated by a departing client's file was determined on a quantum merit basis." The Court added that "such arrangements, as long as they are reasonable, should be encouraged." *Id*.  Fee-splitting agreements, such as the shareholder agreement in this case, cover fees that might be attributable to the departing attorney's work on a case after separation from the law firm. *Torpey v. Secrest, Wardle, Lynch, Hampton, Truex, Morley, PC*, 2003 WL 21958289, at *5 (Mich. Ct.App. 2003), citing *McCroskey* ("Indeed, the fee-splitting arrangement upheld in *McCroskey* clearly applied to work performed after the attorney left the firm.").

But even if the shareholder agreement is not considered a fee-splitting agreement,

its percentages still govern the distribution of the Hankins fee. In *Jewel v. Boxer*, 156 Cal. App.3d 171, 203 Cal. Rptr.13 (1984), the law firm of Jewel, Boxer and Elkind dissolved, with Jewel and Boxer forming separate law firms. There was no agreement as to the allocation of fees from active cases upon dissolution of the partnership. The Court held that "absent a contrary agreement, any income generated through the winding up of unfinished business is allocated to the former partners according to their respective interests in the partnership." 156 Cal. App.3d at 176. The Court considered the active cases as unfinished business of the former law firm. The *Jewel* Court described the "sound policy reasons" for this rule:

> "The rule prevents partners from competing for the most remunerative cases during the life of the partnership in anticipation that they might retain those cases should the partnership dissolve. It also discourages former partners from scrambling to take physical possession of files and seeking personal gain by soliciting a firm's existing clients upon dissolution." *Id*. at 179.

Rejecting the trial court's allocation of fees on the basis of *quantum meruit*, the *Jewel* Court held:

> "In short, the trial court's allocation of postdissolution income to the old and new firms on a quantum meruit basis constituted error. The appropriate remedy is to remand the cause for posttrial proceedings to allocate such income to the former partners of the old firm in accordance with their respective percentage interests in the former partnership." *Id*. at 180.

The law firm in *Jewel* was a partnership, not a corporation, and the Court relied in part on the Uniform Partnership Act, Cal. Corp. Code § 15001 *et seq*. However, in *Fox v. Abrams*, 163 Cal. App.3d 610, 210 Cal. Rptr. 260 (1985), the Court, noting that "*Jewel v. Boxer* was not based solely on partnership law but also cited 'sound policy reasons' for its decision," *id*. at 616, applied the "ownership percentage" rule to law firms that practiced as professional corporations. Citing the fiduciary obligations of law partners discussed in *Jewel*, the Court found

> "that attorneys practicing together in a law corporation owe each other fiduciary duties very similar to those owed by law partners, and therefore the fact that a law corporation is involved is no reason to disregard the fair and reasonable principles of *Jewel v. Boxer* or to interpret the parties' agreement in a manner favoring one group over another." *Id*. at 617.

In *Vowell & Meelheim, P.C. v. Beddow, Erben & Bown, P.A.*, 679 So.2d 637 (S.Ct. Ala. 1996), the Alabama Supreme Court also applied the *Jewel* methodology to a fee dispute between professional legal corporations, noting that "the majority rule requires that legal fees earned from clients of the partnership or professional association be divided according to the interest of each partner in the partnership or the interest of each shareholder in the professional association." *Id*. at 640 (citing cases).[3]

While I have some concern with the manner in which Mr. Guzall left his former law firm–that is, surreptitiously taking client files on Super Bowl Sunday, when no one would be in the office, and leaving a note on Mr. Seifman's chair for him to find on Monday morning–it is not necessary to make a finding that Mr. Guzall breached his fiduciary duty to the firm, and I decline to make that finding. The *Jewell* methodology of dividing post-dissolution fees according to the ownership interest of each shareholder is

---

[3] In *Kohl, Harris, Nolan & McCarthy, P.C. v. Peters*, 2008 WL 183294 (Mich. Ct. App. 2008), there was both a fee-splitting agreement and a shareholder agreement. The Court stated:

> "While no Michigan case law is directly on point, we note that a majority of jurisdictions treat a pending contingent-fee case taken by a terminating attorney as an *asset* of the originating firm and that, upon collection of the contingency fee, the terminating attorney has a continuing fiduciary duty in regard to fee splitting, and must comply with the terms of any applicable fee-splitting agreement." *Id*. at *3 (emphasis in original).

In support of this proposition, the *Kohl* Court cited *Jewel*, *Fox*, and *Vowell*, all of which involved partnership or shareholder agreements *not* explicit fee-splitting agreements. The import of *Kohl* is that for purposes of distributing fees among former law partners, a shareholder agreement that allocates a percentage ownership to each shareholder is the functional equivalent of a fee-splitting agreement.

fair and reasonable," and may be applied without the necessity of litigating the issue of whether there was a fiduciary breach. *See Fox*, 163 Cal. App.3d at 617.

One final point. In *Vowell*, the Court noted that on remand, the trial court in *Jewell*

> "made an equitable adjustment in this majority rule. In order to adjust the allocation of fees to achieve what the trial court deemed a fair result for all concerned, it held that Vowell [the departing attorney who completed the case] would be allowed a reasonable hourly rate for the time spent by the Vowell firm in completing the work on the four cases. Specifically, the trial court found that a reasonable rate for Vowell's time in 1987 would have been $125 per hour. Therefore, based on the total fee the Vowell firm had received in each of the four cases at issue here, the trial court calculated Vowell's compensation for the hours spent on each case, plus Vowell's 21% interest in the fees, and then calculated the total amount due the Beddow firm [the originating firm]...."

The testimony at the evidentiary hearing shows that Mr. Guzall spent a considerable amount of time on Mr. Hankins' case, both as a shareholder in Seifman & Guzall and at his own firm, and he clearly obtained excellent results for Mr. Hankins. I therefore recommend that this Court apply the same equitable adjustment that the trial court applied in *Jewel*, and in addition to his 25% share of the Hankins fee, award him an additional reasonable amount based on the time expended on behalf of Mr. Hankins after Mr. Guzall parted company with Mr. Seifman.

Specifically, Mr. Guzall testified that he spent 155.5 hours on Mr. Hankins' case after he left Seifman and Guzall (Tr. 49). He incorporated his law practice on February 1, 2012, and gave Mr. Seifman notice that he was leaving on February 6, 2012. The case settled on February 21, 2012. Mr. Guzall also took other files with him, so his claim for 155.5 hours in the three weeks or so he worked on the Hankins case after separating from Mr. Seifman (approximately 52 hours per week on this case alone) seems excessive, especially since he testified that he put in an equivalent amount of time while at Seifman

-10-

& Guzall.  While there is no exact methodology for determining a specific number of hours to attribute to Mr. Guzall–and he neither kept nor provided contemporaneous time records–it would be reasonable, and within this Court's discretion, to award him 80 hours, considering that before settlement he would have spent time in trial preparation.  In addition, and with reference to the State Bar of Michigan's most recent Economics of Law Practice Survey, an hourly rate of $300.00 is reasonable.

This would give Mr. Guzall an award of 25% of the Hankins fee, plus $24,000.00 ($300 x 80), with the remaining portion of the fee going to Mr. Seifman.

### III.    CONCLUSION

I recommend that Plaintiff's Motion for Determination of Attorney Fees and Costs [Doc. #109] be GRANTED, and that the attorney fee be divided between Mr. Seifman and Mr. Guzall, with Mr. Guzall receiving 25% plus an additional $24,000.00, and Mr. Seifman receiving the remainder.

Any objections to this  Report and Recommendation must be filed  within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: December 8, 2017

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on December 8, 2017, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager to the
Honorable R. Steven Whalen